GRE-TER ENTERPRISES, INC.,       )
                                    )
             Plaintiff,       )
                                    )
             v.           )     No. 1:17-cv-03554-SEB-DLP
                                    )
MANAGEMENT RECRUITERS       )
INTERNATIONAL, INC.,            )
BROWNS CANYON CORPORATION,   )
FRANCHISE SERVICES OF OHIO, INC.,  )
                                    )
            Defendants.    )

## OPINION AND ORDER ON MOTION TO DISMISS (DKTS. 9, 12)

Plaintiff Gre-Ter Enterprises ("Gre-Ter"), an Indiana corporation, sued defendants

Management Recruiters International, a Delaware corporation, and its affiliates[1]

(together, "Management Recruiters") for breach of a franchise agreement and violations

of the Indiana Franchise Act ("Franchise Act"), Ind. Code ch. 23-2-2.5, and the Indiana

Deceptive Franchise Practices Act ("Practices Act"). Ind. Code ch. 23-2-2.7.

Management Recruiters has moved to dismiss Gre-Ter's complaint for failure to state a

claim. Dkt. 9. Management Recruiters also seeks oral argument on its motion. Dkt. 12.

---

[1] These are Browns Canyon Corporation and Franchise Services of Ohio. Management
Recruiters avers that Franchises Services of Ohio no longer exists as an independent concern and
Browns Canyon Corporation is now Browns Canyon, LLC. Br. Supp. 1; *also* Dkt. 13 (Fed. R.
Civ. P. 7.1 corporate disclosure statement).

For the reasons explained below, the motion to dismiss is granted in part and denied in part. Because the briefs adequately present the issues for decision, we deny the motion for oral argument.

## Factual and Procedural Background

The complaint alleges the following, which, read together with the materials attached to the complaint,[2] we take as true for the purposes of the instant motion. Management Recruiters is a franchisor of recruiting and contract-staffing businesses. In 1998 and again in 2005, Gre-Ter entered into franchise agreements with Management Recruiters ("the 1998 agreement" and "the 2005 agreement"; together, "the franchise agreements"). For at least part of the terms of the franchise agreements, Gre-Ter's interest in the franchise has been shared with several individual franchisees, at least some of whom were or are Gre-Ter shareholders. This lawsuit, however, has been brought by Gre-Ter only.

The 1998 agreement granted Gre-Ter the exclusive right to operate a franchise office in the territory of Boone County, Indiana. No restrictions were placed on Gre-Ter's right to do business outside the territory from its Boone County office, nor on the right of other franchisees to do business within Boone County from offices outside the territory. The 2005 agreement granted Gre-Ter the same rights for the territory of Hamilton County, Indiana, excluding the city of Noblesville. But at the time this case was filed,

---

[2] These are the franchise agreements and several amendments to them. They are properly considered on a motion to dismiss, Fed. R. Civ. P. 10(c); *Forrest v. Univ'l Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007), and are cited according to their CM/ECF filing pagination.

Management Recruiters's website informed prospective franchisees that its franchises have "no territory []or border restrictions[,]" and that their prospective "success is not limited by restrictive franchise territories." Compl. ¶ 50. In this way or in others, Management Recruiters "ha[s] allowed other franchisees to locate their offices and operate within" Gre-Ter's exclusive territory. *Id.* ¶ 51.

The franchise agreements further provide that Gre-Ter would pay to Management Recruiters a "national advertising fee," Dkt. 1 Ex. A, at 22 (1998 agreement), or an "advertising, marketing, and public relations fee," *id.* at 159 (2005 agreement), equal to one-half percent of Gre-Ter's gross receipts from the franchise. Other than their designation as advertising fees, the franchise agreements specified nothing about what Management Recruiters was to do with the funds so collected. The 2005 agreement provided that the fees were "for [Management Recruiters's] benefit[.]" *Id.*

The franchise agreements were occasionally amended. In 2002, four new shareholders purchased stock in Gre-Ter. In 2005, Gre-Ter's majority shareholders transferred control of the corporation to its minority shareholders. Both transactions were memorialized in the second and fifth amendments to the franchise agreements,

respectively. *See id.* at 36 (second amendment),[3] 174 (fifth amendment).[4] In 2015, the thirteenth amendment to the franchise agreements memorialized the transfer of a portion of the individual franchisees' interest in the franchise to a new individual. *See id.* at 299.

Franchisors are required by state and federal law to make certain disclosures to prospective franchisees. 16 C.F.R. § 436.2(a); Ind. Code § 23-2-2.5-13. The complaint does not allege that Management Recruiters failed to make the required disclosures to Gre-Ter before it became a franchisee of Management Recruiters in 1998 or 2005. The complaint does allege that, in connection with the changes to Gre-Ter's ownership structure memorialized in the second and fifth amendments, Management Recruiters supplied Gre-Ter with copies of its 2002 and 2004 disclosure statements ("the 2002 disclosure statement" and "the 2004 disclosure statement"; together, "the disclosure statements"). The complaint alleges further that Management Recruiters failed to supply Gre-Ter with its newest disclosure statement upon the 2015 transfer memorialized in the thirteenth amendment.

---

[3] The complaint designates the document cited here as the second amendment to the franchise agreements, Compl. ¶ 14 ("Attached . . . is a true and correct copy of the Second Amendment."), but the record shows only the stock-purchase agreements between Gre-Ter and its new shareholders. Neither Management Recruiters nor its affiliates are parties to, or even referenced in, the cited document. As the document is marked "Exhibit A," Dkt. 1 Ex. A, at 36, it appears that the stock-purchase agreements were attached to the second amendment when it was executed, but a copy of the second amendment itself has been omitted from Gre-Ter's filing.

[4] Unlike the "second amendment," the "fifth amendment" appearing in the record does purport to amend a franchise agreement, but one dated August 17, 1994. Dkt. 1 Ex. A, at 174. The same is true for the "twelfth amendment" cited in the complaint. *Id.* at 296. The "thirteenth amendment" cited in the complaint purports to amend "franchise agreement[s] dated February 28, 2005 [*i.e.*, the 2005 agreement], August 17, 1994, and August 17, 1994 [*sic*]." *Id.* at 299. The confusion on display here and in note 3 *supra*, on which the briefing is entirely silent, does not preclude our decision on the instant motion, but surely does not facilitate it.

Among other requirements, federal regulation required the disclosure statements to state "the franchisor's principal assistance and related obligations" with respect to the "franchisor's assistance, advertising, computer systems, and training." 16 C.F.R. § 436.5(k) (initial capitals omitted). The regulation instructed that, "[f]or each obligation," the franchisor was to "cite the section number of the [standard or form] franchise agreement imposing the obligation." *Id.* The disclosure statements dutifully included a statement of the "FRANCHISOR'S OBLIGATIONS," with sections for *inter alia* "Marketing and Advertising." Dkt. 1 Ex. A, at 191 (2004 disclosure statement), 54 (2002 disclosure statement).

Under this heading, Management Recruiters disclosed that they administered an "Advertising, Marketing and Public Relations Fund (the 'Fund')," *id.* at 191 (2004 disclosure statement), 54 (2002 disclosure statement), which was supported by franchisees' advertising fees. The disclosure statements represented that "[t]he Fund is used exclusively" for advertising and "any other activities which [Management Recruiters] believes will enhance the image of [its] offices." *Id.* at 191 (2004 disclosure statement), 54 (2002 disclosure statement). The disclosure statements represented further that Management Recruiters would supply franchisees with an annual accounting of payments into and from the Fund. While every other section of the disclosure statements describing the franchisor's obligations cited the section number of Management Recruiters's standard franchise agreement that imposed the particular obligation described, none of the disclosures relating to advertising referred to any part of the standard franchise agreement.

In April 2017, Gre-Ter received a "Rep Update article" from Management Recruiters's "U.S. Representative Council." Compl. ¶ 55. The "Rep Update article" is not attached to the complaint and the nature of the "U.S. Representative Council" is not explained there.[5] "The April 2017 Article relay[ed] the representative council members communicated their concerns regarding Fund assets being spent for meetings." *Id.* ¶ 56. Neither the nature of these meetings nor of the spending for them is further explained, though the complaint alleges that the disclosure statements represented that the uses of the Fund "did not include meetings." *Id.* ¶¶ 23 (2002 disclosure statement), 42 (2004 disclosure statement). "The April 2017 Article note[d] both [Management Recruiters] and the representative council agreed the Fund would ideally be spent marketing the brands and offices rather than on meetings." *Id.* ¶ 57.

Between 2012 and 2016, Management Recruiters spent $1,446,301 "on meetings." *Id.* ¶ 60. The complaint does not specifically allege what proportion of these expenditures were made from the Fund. The complaint does allege that Management Recruiters has failed to make an accounting of the Fund when requested to do so by Gre-Ter, despite Management Recruiters's representation of an annual accounting made in the disclosure statements.

---

[5] The disclosure statements note that some portion of moneys in the Fund were spent on "administrative expenses[,] . . . includ[ing] the Regional Representative Council . . . [,]" which "consists of seven Management Recruiters representatives and seven Sales Consultants representatives from the United States[,]" plus "three representatives from the international offices." Dkt. 1 Ex. A, at 54 (2002 disclosure statement); *see also id.* at 191 (2004 disclosure statement) (substantially same).

Gre-Ter filed suit in Hamilton Superior Court, Hamilton County, Indiana, on September 7, 2017. Dkt. 1, at 1. Management Recruiters removed the case to this Court on October 4, 2017, *id.*, properly invoking our diversity jurisdiction. *Id.* at 4. Gre-Ter's six-count complaint charges Count I, breach of contract; Count II, violation of Section 3 of the Franchise Act; Count III, violation of the Practices Act; Count IV, violation of Section 2 of the Practices Act; Count V, violation of Section 9 of the Franchise Act; and Count VI, franchise fraud under Section 27 of the Franchise Act. On October 11, 2017, Management Recruiters moved to dismiss the complaint for failure to state a claim. Dkt. 9; *see* Fed. R. Civ. P. 12(b)(6). The motion is now fully briefed and ripe for decision.

## Standard of Decision

Federal Rule of Civil Procedure 8(a) requires "a short and plain statement showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To satisfy the requirements of Rule 8(a) and withstand a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face . . . ." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible when supported by sufficient factual allegations which, taken as true, give rise to a reasonable inference of liability. *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Legal conclusions, formulaic recitation of elements of the cause of action, and speculative possibilities will not do. *Id.* In all, the pleader must simply "give enough details about the subject-matter of the case to present a story that holds together." *Swanson*, 614 F.3d at 404.

Counts II, V, and VI of the complaint are subject to a heightened pleading standard. Because such claims sound in fraud, the circumstances alleged to constitute the fraud must be pleaded with "particularity." Fed. R. Civ. P. 9(b). Under Rule 9(b), a plaintiff must allege "'the first paragraph of any newspaper story'": "'the who, what, when, where, and how'" of the alleged fraud. *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 853 (7th Cir. 2009) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). While it is "erroneous[]" to "take an overly rigid view of th[is] formulation," *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011), the application of which "may vary on the facts of a given case[,]" *id.*, Rule 9(b) must require "some . . . means of injecting precision and some measure of substantiation . . . [,]" *id.* (quoting 2 James W. Moore, *Moore's Federal Practice* § 9.03 (3d ed. 2010)), if it is to serve its important functions of "forc[ing] the plaintiff to conduct a careful pretrial investigation" and "protect[ing] defendants from [the] 'privileged libel'" of fraud charges. *Id.* at 441 (quoting *Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005); *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003)).

<u>Analysis</u>

**I. Choice of Law**

We address as a preliminary matter the law governing Gre-Ter's claims. Indiana courts (whose choice-of-law rules we adopt in diversity, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)) routinely enforce and, indeed, "favor[] contractual stipulations as to governing law." *Allen v. Great Am. Reserve Ins. Co.*, 766 N.E.2d 1157,

1162 (Ind. 2002). By their terms, the franchise agreements "and all matters relating to or arising out of the relationship between the parties" to them are governed by Ohio law. Dkt. 1 Ex. A, at 170 (2005 agreement), 33 (1998 agreement).

Without developing an argument from it or explaining its relevance to this case, Gre-Ter points us to (more accurately, pilfers from, by quoting it without quotation marks and appending a "*see*" signal, Br. Opp. 3) *Wright-Moore Corp. v. Ricoh Corp.*, 908 F.2d 128 (7th Cir. 1990). There, our federal court of appeals considered the interaction of certain Practices Act prohibitions and an Indiana franchisee's franchise agreement purporting to be governed by New York law.

Specifically, the Practices Act prohibits franchise agreements "requiring the franchisee to . . . assent to a release . . . [or] waiver . . . which purports to relieve any person from liability to be imposed by" the Practices Act, Ind. Code § 23-2-2.7-1(5), or "limiting litigation brought for breach of the agreement in any manner whatsoever." *Id.* § 23-2-2.7-1(10). Because the franchise agreement permitted termination without good cause and a unilateral change of credit terms, enforceable under New York law but in violation of the Practices Act, and enforcement of the franchise agreement therefore would have permitted the franchisor to contract away the franchisee's statutory protections in violation of the forum state's declared public policy, the Seventh Circuit held that an Indiana court would apply Indiana law to the franchise agreement. *Wright-Moore Corp.*, 908 F.2d at 133, 133 n.1.

However, whereas nothing in the franchise agreements here or their chosen law conflicts with Indiana franchise law, to that extent the parties' choice of law controls. *Id.*

at 133 n.1 (citing *Sheldon v. Munford, Inc.*, 660 F. Supp. 130 (N.D. Ind. 1987) (no

Indiana public policy against contractual provisions at bar relating to territory and

noncompetition provisions)); *Hubbard Auto Ctr., Inc. v. Gen. Motors Corp.*, 422 F. Supp.

2d 999, 1003 (N.D. Ind. 2006) (party choice controls where no conflict). State-specific

riders to the instant franchise agreements, purporting to rely on the statutory

interpretation of the Indiana securities commissioner, contemplate this result. Dkt. 1 Ex.

A, at 172 (Indiana rider to 2005 agreement) (citing Practices Act's prohibitions on waiver

of Practices Act rights and litigation limitation, stating opinion of Indiana securities

commissioner that Indiana franchise law must prevail if in conflict with Ohio law), 35

(Indiana rider to 1998 agreement) (same).

In any event, federal "[c]ourts do not worry about conflict of laws unless the

parties disagree on which state's law applies." *Wood v. Mid-Valley Inc.*, 942 F.2d 425,

427 (7th Cir. 1991). Here, the parties do not disagree; by failing to make any argument as

to which jurisdiction's law applies to its case, Gre-Ter has only vaguely gestured in the

direction of a potential disagreement. [6] Thus, we hold, Ohio law governs the franchise

agreements without limitation of any Franchise or Practices Act liability.

---

[6] Moreover, Indiana "permits state public policy [as that declared by the Franchise and Practices Acts] to override contractual choice of law only if the state has a materially greater interest in the litigation than the contractually chosen state." *Wright-Moore Corp.*, 908 F.2d at 132–33; *see* Restatement (Second) of Conflict of Laws § 187(2)(b) (Am. Law Inst. 1988). As the presumable proponent of applying Indiana law, it is Gre-Ter's burden to plead facts suggesting, or otherwise to show, that Indiana's interest in this case is materially greater than Ohio's. It has not done so. However, as Management Recruiters has not argued that the Franchise and Practices Acts do not apply, and in view of the express contractual contemplation of their application, we assume for the sake of decision that they do.

**II.  Count I: Breach of Contract**

Under Ohio law, "[i]n order to substantiate a breach of contract claim, a party must establish four elements: (1) a binding contract or agreement was formed; '(2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach.'" *Carbone v. Nueva Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017) (quoting *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E2d 1261, 1266 (Ohio Ct. App. 1996)) (alterations omitted).

The complaint, Gre-Ter asserts, sufficiently "alleges breaches of [the parties'] contracts in numerous ways including provisions related to territory, use of the Fund, and failure to provide an accounting." Br. Opp. 9. The sufficiency of the latter two allegations depends on Gre-Ter's assertion that Management Recruiters's disclosure statements are enforceable against it as part of the parties' contracts. We address that assertion below, for Count I is saved by a single nonconclusory allegation of breach of the franchise agreements themselves.

*A.  Breach of the Franchise Agreements*

Gre-Ter alleges that Management Recruiters has "allowed other franchisees to locate their offices . . . within [Gre-Ter's] exclusive territory and borders." Compl. ¶ 51. If true, this practice would violate the franchise agreements. We observe that the balance of Gre-Ter's complaint and its briefing strongly suggest that this allegation refers only to Management Recruiters's current practice of offering franchise agreements without territorial restrictions, not to any specific franchisee to whom Management Recruiters has

granted a franchise to operate an office within Gre-Ter's territory—such that

Management Recruiters has, at most, invited rather than committed a breach of contract.

Nevertheless, we must take paragraph 51 of the complaint as pleaded and draw every

nonspeculative inference in Gre-Ter's favor.

In a footnote in its opening brief, Management Recruiters argues that, "to the

extent that Gre-Ter's claim arises from the allegation that [Management Recruiters] has

allowed other franchisees to locate their offices within Gre-Ter's territory (*see* Compl. ¶

51), there is no breach because the franchise agreements were amended to allow for such

stores within Gre-Ter's territory[.]" Br. Supp. 11 n. 6 (citing twelfth amendment to

franchise agreements, Dkt. 1 Ex. A, at 296–97). That does not quite tell the whole story,

however. By its terms, the twelfth amendment to the franchise agreements returned a

portion of Gre-Ter's territory to Management Recruiters for the use of one prospective

franchisee "Ellis"; permitted Management Recruiters to grant an easement to Ellis to

operate an office at a certain address within Gre-Ter's territory, on the condition *inter*

*alia* that Ellis be prohibited from operating offices both at the easement address and

within the transferred territory; and finally memorialized the right of one "Campeas" to

operate an office within Gre-Ter's territory.

The upshot is that Management Recruiters is wrong to suggest that the twelfth

amendment extended blanket permission to other franchisees to operate within Gre-Ter's

territory. Rather, the amendment appears to have redefined that territory and subjected its

exclusivity only to the circumscribed rights of Ellis and Campeas. None of this defeats or

is even inconsistent with Gre-Ter's allegation that Management Recruiters has "allowed

other franchisees to locate their offices . . . within [its] exclusive territory and borders." Compl. ¶ 51. In its reply brief, Management Recruiters insists it has continued to honor the terms of its agreements with Gre-Ter, including the twelfth amendment. Br. Reply 4. If true, that is a good defense to the action; it is not grounds for dismissal. Count I survives.

### B. Enforceability of the Disclosure Statements

We turn here to the enforceability of the disclosure statements, a question which, while strictly unnecessary to a resolution of Count I, bears on subsequent charges in the complaint. "Clearly the disclosure statements are writings intended to be part of the parties' arrangement[,]" says Gre-Ter. Br. Opp. 11. But not even the adverb makes it so. Gre-Ter's opposition brief is wholly devoid of citations to controlling or, indeed, any law of contract formation or contract integration.

Under Ohio law, contract formation requires "'offer, acceptance, contractual capacity, consideration, . . . a manifestation of mutual assent[,] and legality of object and of consideration.'" *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002) (quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F. Supp. 409, 414 (N.D. Ohio 1976)). It is undisputed that the franchise agreements are enforceable.[7] The question here is whether the complaint plausibly alleges that the parties manifestly mutually assented to the terms of the disclosure statements as a part of their enforceable agreement. It does not.

---

[7] Unless set aside for fraud or as contrary to public policy, a possibility discussed below. *See* note 8 *infra* and accompanying text.

Absent grounds for invalidation, "the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of . . . prior written agreements." *Galmish v. Cicchini*, 734 N.E.2d 782, 788 (Ohio 2000) (quotations, citation omitted). "[A] written contract which appears to be complete and unambiguous on its face will be presumed to embody the final and complete expression of the parties' agreement." *Fontbank, Inc. v. CompuServe, Inc.*, 742 N.E.2d 674, 678 (Ohio Ct. App. 2000) (citing *inter alia Ayres v. Cook*, 46 N.E.2d 629, 632 (Ohio Ct. App. 1941)). The presumption of integration "is strongest where a written agreement contains a merger or integration clause expressly indicating that the agreement constitutes the parties' complete and final understanding regarding its subject matter." *Id.* at 678–79.

Gre-Ter supplies no grounds for permitting the terms of the franchise agreements to be supplemented by the terms of the disclosure statements. The franchise agreements appear to be complete and unambiguous on their face. By their terms, as relevant here, they raise no suggestion that they incorporate other provisions, written or oral. Indeed, the franchise agreements' integration clauses expressly provide the contrary: "ENTIRE AGREEMENT. This Agreement contains the entire agreement among [Management Recruiters] and [Gre-Ter], and there are no representations, inducements, arrangements, promises or agreements outstanding between them, either oral or in writing, other than those herein contained." Dkt. 1 Ex. A, at 171 (2005 agreement), 33 (1998). Nothing in the complaint plausibly overcomes the "strongest" presumption of integration created by the terms of the franchise agreements. *Fontbank*, 742 N.E.2d at 678.

Moreover, the disclosure statements themselves give no indication that they were intended to be an enforceable part of the parties' contracts. As to their advertising provisions in particular, they alone among the disclosed "franchisor's obligations" are unaccompanied by any corresponding reference to the section of the franchise agreements purporting to impose them. Given the express command of federal regulation to supply such references, *see* 16 C.F.R. § 436.5(k), as well as under a common-sense reading of the disclosure statements as a whole, this is strong evidence, if any further were needed, that the advertising provisions in the disclosure statements were not intended to be an enforceable part of the parties' contracts.

Accordingly, under Count I and elsewhere, we treat the disclosure statements as wholly unenforceable, and disregard without further comment arguments predicated on their enforceability or on any alleged "breach" of them.

## III.  Counts II, V, and VI: Franchise Act Violations

The Franchise Act generally requires franchisors to register with the Indiana securities commissioner and to provide prospective franchisees with a disclosure statement. Specifically, Section 9 of the Act provides that "[n]o person may offer or sell any franchise" unless the franchise is registered with the commissioner and a disclosure statement has been provided, or unless the franchisor is exempt from such requirements. Ind. Code § 23-2-2.5-9. Section 3 of the Act establishes an exemption from the requirements of Section 9 if certain conditions are met. The Act's registration and disclosure requirements are privately enforceable only through the Act's antifraud provision, Ind. Code § 23-2-2.5-27, "for acts which constitute fraud, deceit or

misrepresentation." *Cont'l Basketball Ass'n, Inc. v. Ellenstein Enters., Inc.*, 669 N.E.2d 134, 137 (Ind. 1996).

Section 27 provides as follows:

> It is unlawful for any person in connection with the offer, sale or purchase of any franchise . . . directly or indirectly:
>
> (1) to employ any device, scheme or artifice to defraud;
>
> (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or
>
> (3) to engage in any act which operates or would operate as a fraud or deceit upon any person.

Ind. Code § 23-2-2.5-27. "The core elements" of franchise fraud under Subsections 2 and 3 are "a statement or omission, materiality, and falsity[,]" *Enservco, Inc. v. Ind. Secs. Div.*, 623 N.E.2d 416, 423 (Ind. 1993), as well as "harm caused by reliance on the statement or omission." *Id.* at 425. Fraud by "'[a]ny promise or representation or prediction as to the future'" requires that the prediction be "'not made honestly or in good faith[.]'" *Id.* at 423 (quoting Ind. Code § 23-2-2.5-1(f)); also *id.* at 423 n. 11. Subsection 1 franchise fraud requires these elements plus scienter. *Id.* at 423.

Counts II and V of the complaint charge violations of Section 3's exemption provision and Section 9's registration and disclosure provisions, respectively. Freestanding, these provisions are not privately enforceable. *Cont'l Basketball Ass'n*, 669 N.E.2d at 137. Nor does their violation *per se* render a franchise agreement void or

voidable.[8] *Id.* at 140–41. Violations of them may, however, be considered as evidence of franchise fraud under Section 27.

But Gre-Ter has not adequately pleaded any failure of registration and disclosure in violation of Section 3 or Section 9. Preliminarily, we note that, although their violations are pleaded separately, these two statutory sections are not separately violable. More specifically, as Management Recruiters points out, Br. Supp. 6, a franchisor cannot independently "violate" Section 3. A franchisor is either exempt under Section 3 from the requirements of Section 9, in which case its conduct cannot violate Section 9, or it is not exempt under Section 3, in which case its conduct may violate Section 9. Any allegation of a "violation" of Section 3 is merely a restated allegation of a violation of Section 9.

Section 9 provides, first, that "[n]o person may offer or sell any franchise . . . unless the franchise is registered . . . or is exempt . . ." Ind. Code § 23-2-2.5-9(1). Under Count V, "Violation of [Section 9]," Gre-Ter alleges, "[Management Recruiters] ha[s] not and [is] not registered with Indiana governmental agencies" and "[Management Recruiters is] not exempt from registration with Indiana governmental agencies." Compl. ¶¶ 93–94. These barebones recitations, which merely negate the statutory language, are

---

[8] Contrary to Gre-Ter's expectation, it may not both disavow a contract—whether for fraud, illegality, or another reason—and win damages for its breach; it must elect one of these inconsistent remedies before final judgment. This is so no matter whether Indiana or Ohio law applies. *UFG, LLC v. Sw. Corp.*, 848 N.E.2d 353, 361–62, 364 (Ind. Ct. App. 2006) (citing *Cahoon v. Cummings*, 734 N.E.2d 535, 542 (Ind. 2000)); *Fenstermaker v. Elwood*, 479 N.E.2d 908, 911 (Ohio Ct. App. 1984) (citing *inter alia Frederickson v. Nye*, 144 N.E. 299 (Ohio 1924)). We note that invalidation is not an available remedy under the Practices Act at all. Ind. Code § 23-2-2.7-4 (creating cause of action for Practices Act violation) ("an action to recover damages, or reform the franchise agreement").

the first mention in the complaint of any nonexempt failure to register. They are unsupported by any other complaint allegations and so legally conclusory as to be disentitled to the presumption of truth on a motion to dismiss. We therefore disregard them.

Section 9 provides, second, that "[n]o person may offer or sell any franchise . . . without first providing to the prospective franchisee . . . a disclosure statement . . . ." Ind. Code § 23-2-2.5-9(1); *see id.* § 23-2-2.5-9-13 (defining "disclosure statements"). Under Count V, Gre-Ter conclusorily alleges that Management Recruiters failed to provide disclosure statements to prospective franchisees. But in the body of the complaint, Gre-Ter never alleges that Management Recruiters failed to provide disclosure statements to Gre-Ter when *it* was a prospective franchisee, arguably,[9] in 1998 and 2005, before the respective franchise agreements were concluded. The complaint does allege that no disclosure statement was furnished upon the 2015 transfer of partial ownership interest memorialized in the thirteenth amendment, but *Gre-Ter* was not then a prospective franchisee. Accordingly, we find in the complaint no plausible allegation of a Section 9 violation.

More importantly, and no matter whether Gre-Ter has adequately pleaded violations of Section 3 or Section 9, Gre-Ter has not come within a country mile of alleging any fraud "in connection with the offer, sale or purchase of any franchise" as would satisfy Rule 8(a), not to speak of Rule 9(b). Ind. Code § 23-2-2.5-27. Not a single

---

[9] As noted above, but has gone unremarked-on in the briefing, Gre-Ter's first franchise agreement with Management Recruiters appears to have been executed in 1994.

one of the eight paragraphs set forth under Count VI, "Violation of [Section 27]," contains a nonconclusory factual allegation of fraud. Gre-Ter has not identified with particularity a single false statement or misleading omission allegedly made by an agent or principal of Management Enterprises, by whom it was made, to whom it was made, or when and where it was made; a single fact that would support an inference that any prediction as to the future was not made honestly or in good faith; or a single fact that would support an inference of scienter. We have not the faintest notion of Gre-Ter's theory of the alleged fraud. There are, in short, not even enough "details . . . to present a story that holds together" so as to satisfy Rule 8(a). *Swanson*, 614 F.3d at 404.

Counts II and V charge wrongs which are not privately redressable. Count VI fails to satisfy the applicable pleading standards. Counts II, V, and VI must therefore be dismissed.

## IV. Counts III and IV: Practices Act Violations

The Practices Act creates a private right of action for damages or reformation in any franchisee who is party to a franchise agreement containing a provision prohibited by Section 1 of the Act or who is injured by a practice prohibited by Section 2 of the Act. Ind. Code § 23-2-2.7-4. *See id.* § 23-2-2.7-1 (prohibited provisions of franchise agreement); *id.* § 23-2-2.7-2 (prohibited practices "in relation to [franchise] agreement").

"No action may be brought for a violation of [the Practices Act] more than two . . . years after the violation." *Id.* § 23-2-2.7-7.[10] For the purposes of Section 1, a violation

---

[10] Though the statute of limitations is an affirmative defense not ordinarily raised on a motion to dismiss, the defense may be entertained if its predicates are established by the complaint as a

occurs, and the limitations period begins to run, when a franchise agreement containing the prohibited provision is executed. *Monroe Cty. Oil Co., Inc. v. Amoco Oil Co.*, 75 B.R. 158, 162 (S.D. Ind. 1987) (Steckler, J.); *Anderson v. Indianapolis Ind. AAMCO Dealers Advert. Pool*, 678 N.E.2d 832, 836 (Ind. Ct. App. 1997). For the purposes of Section 2, Management Recruiters argues that the limitations period "does not embody a discovery rule" and the two-year period therefore begins to run from the time the franchisor engages in the prohibited conduct, no matter whether an asserted injury has ripened, and a claim for it accrued, within that time. Br. Supp. 7.[11]

## A. Count III: Section 1 Prohibited Provisions

Count III charges a violation of an unidentified provision of the Practices Act. Under that heading, the complaint alleges that Management Recruiters has "made substantial modifications of franchise agreements by the franchisor without the consent in

---

matter of law. *Bader v. Air Line Pilots Assoc.*, 113 F. Supp. 3d 990, 997 (N.D. Ill. 2015) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

[11] There is a dearth of precedent on this issue. But in the context of franchisee discrimination, a prohibited practice under Section 2, in a different case we have previously accepted a defendant's contention that the limitations period is "occurrence-based" rather than a rule of discovery, though plaintiffs' claim would have been untimely under either construction. *Craig & Landreth, Inc. v. Mazda Motor of Am., Inc.*, 744 F. Supp. 2d 818, 831 (S.D. Ind. 2010) (Barker, J.). *Compare* Ind. Code § 23-2-2.5-30 (Franchise Act limitations period) ("A person may not maintain an action . . . unless brought before the expiration of three . . . years after discovery . . . of the facts constituting the violation.") *and id.* § 34-11-2-4(a) (general tort limitations period held to be discovery rule, *Barnes v. A.H. Robins Co., Inc.*, 476 N.E.2d 84, 86 (Ind. 1985)) ("An action . . . must be commenced within two . . . years after the cause of action accrues.") *with id.* § 23-2-2.7-7 (Practices Act limitations period) ("No action may be brought . . . more than two . . . years after the violation.") *and id.* § 34-18-7-1(b) (Medical Malpractice Act limitations period held to be "occurrence" rule*, Martin v. Richey*, 711 N.E.2d 1273, 1278 (Ind. 1999)) ("A claim . . . may not be brought . . . unless . . . filed within two . . . years after . . . the alleged act, omission, or neglect[.]").

writing of franchisees or Plaintiff." Compl. ¶ 80. As this is not a prohibited practice under

Section 2, we take this allegation to be directed to the prohibition in Section 1 on

franchise agreement provisions "[a]llowing substantial modification of the franchise

agreement by the franchisor without the consent in writing of the franchisee." Ind. Code §

23-2-2.7-1(3).

As Management Recruiters points out, the franchise agreements contain no such

prohibited provision. In fact, both agreements provide that "[a] modification or waiver of

any of the provisions of th[ese] Agreement[s] shall be effective only if made in writing

and executed with the same formality as th[ese] Agreement[s]." Dkt. 1 Ex. A, at 171

(2005 agreement), 33 (1998 agreement). That is the end of Count III. *See Forrest v.*

*Univ'l Sav. Bank, F.A.*, 507 F.3d 540, 542 (7th Cir. 2007) (where conflict between

complaint and exhibit, exhibit "typically" controls). Even if it were not, both franchise

agreements were executed more than a decade before Gre-Ter filed this lawsuit; any

claim under Section 1 of the Practices Act is therefore untimely by at least three

presidential administrations. Gre-Ter's attempts to resist this result are either not

comprehensible to the Court or else are the old wine of its breach-of-contract allegations

poured into the new skin of the Practices Act.

### B. Count IV: Section 2 Prohibited Practices

Count IV charges violations of Section 2 of the Practices Act. The complaint

points specifically to Subsection 5, prohibiting a franchisor from "[d]iscriminating

unfairly among its franchisees or unreasonably failing or refusing to comply with any

terms of a franchise agreement[,]" Ind. Code § 23-2-2.7-2(5), and Subsection 8,

prohibiting a franchisor from "[u]sing deceptive acts in connection with the franchise or the franchisor's business." *Id.* § 23-2-2.7-2(8).

As for franchisee discrimination under Subsection 5, the Seventh Circuit, in the absence of guidance from the state courts, has held

> that "discrimination among franchisees that as between two or more similarly situated franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment toward the discriminatee than toward other franchisees." In order to prove discrimination, plaintiffs must therefore make a showing of "arbitrary disparate treatment among similarly situated individuals or entities."

*Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 604 (7th Cir. 2017) (quoting *Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis*, 723 F.2d 512, 521 (7th Cir. 1983)) (alteration, internal citation omitted). Without giving a full account of "what it takes to 'discriminate unfairly' as the [Practices Act] uses the term[,]" *id.* at 605, the court pointed out that neither disparate treatment, *id.* at 606, nor even arbitrary disparate treatment, *id.* at 607, necessarily suffices to make out a claim for unfair disparate treatment.

The complaint raises no plausible inference that Gre-Ter has been injured by any unfair disparate treatment by Management Recruiters. The nonconclusory factual allegations set forth under Count IV do not relate to disparate treatment of any description. *See* Compl. ¶¶ 88–89. In its brief, Gre-Ter argues that Management Recruiters has discriminated against it by failing to honor its territorial exclusivity. But this is nothing more than the breach of contract alleged in Count I and discussed above. There are no factual allegations relating to similarly situated comparators, to how those

comparators have been arbitrarily treated more favorably than Gre-Ter, or to how such disparate treatment has been *unfair*.

As for unreasonable failure or refusal to comply with the franchise agreement under Subsection 5, again Gre-Ter adverts to its breach-of-contract allegations. Though here as elsewhere we proceed with little precedent to guide us, it is clear at least that Subsection 5 is not merely duplicative of the common-law action for breach of contract, for Indiana courts presume that the Indiana General Assembly "did not enact a useless provision." *Hinshaw v. Bd. of Comm'rs*, 611 N.E.2d 637, 638 (Ind. 1993). The claim under Subsection 5 is therefore presumptively narrower than the common-law action: the franchisor's breach of the franchise agreement must be due to an "*unreasonable* fail[ure] or refus[al] . . . ." Ind. Code § 23-2-2.7-2(5) (emphasis added). And no allegations in the complaint give rise to a plausible inference that Management Recruiters refused not to grant a new franchisee an office in Gre-Ter's exclusive territory after being asked not to do so by Gre-Ter, or that Management Recruiters's alleged breach was otherwise "unreasonable," beyond simply constituting a breach.

Finally, as for the use of deceptive acts in connection with the franchise or the franchisor's business under Subsection 8, the complaint alleges that Management Recruiters "presented for signing a franchise agreement in which the terms and conditions differed materially from those presented in the template contained in the disclosure document, and [Management Recruiters] did not inform prospective franchisees and [Gre-Ter] of the differences before execution of franchise agreements [*sic*]." Compl. ¶ 89.

As to Management Recruiters's conduct toward other franchisees or prospective franchisees, Gre-Ter obviously cannot maintain an action for another's injuries. *See* Ind. Code § 23-2-2.7-4; *also* U.S. Const. art. III. As to Gre-Ter itself, even assuming that the alleged bait-and-switch could constitute a deceptive act within the meaning of the Practices Act, *contra Volvo Trucks N. Am. v. Andy Mohr Truck Ctr.*, No. 1:12-cv-448, 2014 WL 4794185, at *13 (S.D. Ind. Sept. 25, 2014) (Lawrence, J.) (holding Subsection 8 applies only to deceptive acts occurring after execution of franchise agreement), *aff'd in relevant part*, 869 F.3d 598 (7th Cir. 2017), such a claim is unambiguously barred by the two-year limitations period, no matter whether the statute of limitations embodies a discovery rule.

The 2005 agreement was executed on February 28, 2005. Dkt. 1 Ex. A, at 158. Even if the limitations period is governed by a discovery rule, and thus did not begin to run until Gre-Ter's injury was discovered or discoverable with the exercise of reasonable diligence, *see Barnes v. A.H. Robins Co., Inc.*, 476 N.E.2d 84, 86 (Ind. 1985), any injury flowing from a discrepancy between the disclosure statement and the franchise agreement was discoverable with the exercise of reasonable diligence once Gre-Ter was handed the franchise agreement to sign no later than February 28, 2005. A claim for such injury is therefore more than a decade late.

The complaint contains no plausible allegations of an actionable Practices Act violation. Counts III and IV must therefore be dismissed.

**V.  The 2010 Release**

In its reply brief, Management Recruiters raises a new argument for dismissal: the execution in 2010 of a general release of Management Recruiters by "Young," a former Gre-Ter shareholder. Management Recruiters points to the following language therein:

> [Young] on behalf of [Young's] affiliates, officers, directors, shareholders, employees, agents, successors and assigns, hereby releases [Management Recruiters], its affiliates, officers, directors, shareholders, employees, agents, successors and assigns from all claims and causes of action which [Young] has or may have, whether known or unknown, against [Young] [*sic*] relating to any occurrence or transaction up to and including the date of this [release], including any claims arising out of [Young's] purchase of the franchises, the acts of the parties during the term of the Franchise Agreements, or the acts of any other franchisee of [Management Recruiters], including any claim for breach of contract, fraud, unfair competition, violation of any federal or state antitrust, franchise, securities, and/or other law or regulation.

Dkt. 22 Ex. 4, at 2.

This argument fails for four reasons which may be briefly stated. First, new arguments may not be raised in reply. *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 249 F.R.D. 530, 536 (N.D. Ill. 2008). Second, only affirmative defenses established by the complaint (including documents attached to it) will be heard on a motion to dismiss for failure to state a claim. *Bader v. Air Line Pilots Assoc.*, 113 F. Supp. 3d 990, 997 (N.D. Ill. 2015). Third, the release ineffectually releases "[Management Recruiters] . . . from all claims and causes of action which [Young] has or may have, whether known or unknown, against [*Young*] . . . [,]" Dkt. 22 Ex. 4, at 2 (emphasis added), not from all claims which Young had or may have had against Management Recruiters. Fourth, even if the release were construed to release claims

against Management Recruiters, the release could only operate to release Management Recruiters from "all claims and causes of action which [*Young*]" had or may have had, *id.* (emphasis added), not those which Gre-Ter had or has now.[12] Management Recruiters is not entitled to dismissal on the basis of the release.

## Conclusion and Order

Despite its best efforts, Gre-Ter has narrowly avoided dismissal of its entire complaint. For the sake of a "just, speedy, and inexpensive determination of [this] action," Fed. R. Civ. P. 1, we urge a disciplined cabining of discovery on the single remaining question of whether Count I presents a triable issue. The Magistrate Judge's assistance will greatly enhance the march toward that goal. We urge as well a prompt invocation of that help by the parties.

For the reasons explained above:

As to COUNT I, the motion to dismiss is DENIED.

As to COUNTS II, III, IV, V, and VI, the motion to dismiss is GRANTED. COUNTS II, III, IV, V, and VI are DISMISSED. Dismissal is without prejudice but without leave to replead. Such leave may be sought in the ordinary course and will be granted only on a clear showing that the above recited deficiencies as to these counts have been cured.

---

[12] Management Recruiters argues that, as Young's interest in the franchise was transferred to Gre-Ter under the release, and "[t]he release is made on behalf of [Young's] successors and assigns, which include Gre-Ter[,]" therefore "Gre-Ter has released [Management Recruiters] . . . ." Reply Br. 20. This is incorrect. Young's release of *Young's* claims bars any successors or assigns of those claims from bringing them; Young's release nowhere purports to release *others'* claims against Management Recruiters, including Gre-Ter's.

The motion for oral argument is also DENIED.

IT IS SO ORDERED.

Date:    6/26/2018

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jonathan A. Becker
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
jbecker@cchalaw.com

Julia C. Colarusso
GRAY PLANT MOOTY MOOTY & BENNETT PA
Julia.Colarusso@gpmlaw.com

Eric Michael Douthit
CHURCH CHURCH HITTLE & ANTRIM (Noblesville)
edouthit@cchalaw.com

Maisa Jean Frank
GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.
Maisa.Frank@gpmlaw.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

Liberty L. Roberts
CHURCH CHURCH HITTLE & ANTRIM (Fishers)
lroberts@cchalaw.com

Jere A. Rosebrock
WOODEN & MCLAUGHLIN LLP (Indianapolis)
jere.rosebrock@woodenlawyers.com

John D. Waller

WOODEN & MCLAUGHLIN LLP (Indianapolis)
john.waller@woodenlawyers.com

Eric L. Yaffe
GRAY, PLANT, MOOTY, MOOTY & BENNETT, P.A.
eric.yaffe@gpmlaw.com